JRB/AKA USAO 2021R00597

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| v. | * | **CRIMINAL NO. GJH-21-396** |
| **EUNICE BISONG NKONGHO,** | * | (Money Laundering Conspiracy, 18 U.S.C. § 1956(h); Money Laundering, 18 U.S.C. § 1956(a)(1)(A) and (B); Aiding and Abetting, 18 U.S.C. § 2; Forfeiture, 18 U.S.C. § 982(a)(1) and (b)(1), 21 U.S.C. § 853(p)) |
| Defendant | * | |

\*\*\*\*\*\*\*

## INDICTMENT

### COUNT ONE
### (Money Laundering Conspiracy)



The Grand Jury for the District of Maryland charges that:

At all times relevant to this Indictment:

#### Introduction and Background

1. The email address "Daniel.Drunz@navy-mil.us" was a registered Yahoo, Inc., email address and was not an email address registered on the official United States Navy email domain.

2. Victim Company 1 was a company headquartered in the State of Washington that provided wireless voice and data services.

3. Victim Company 2 was a wholesale audio-video distributor and manufacturer's representative located in the Commonwealth of Virginia.

4. Victim Company 3 was a cleared United States defense contractor headquartered in the State of Maryland that designed, manufactured, and marketed communications equipment.

5. United Parcel Service, Inc. ("UPS") and Federal Express Corporation ("FedEx") were American multinational courier delivery services companies that were in the business of providing logistics services, including transportation, distribution, ground freight, ocean freight, customs brokerage, insurance, and financing. UPS was headquartered in Sandy Springs, Georgia. FedEx was headquartered in Memphis, Tennessee.

6. WhatsApp was an encrypted Internet-based multimedia messaging service used via a smartphone application that functioned using both cellular and wireless data connections.

## The Conspiracy

7. From a time unknown to the Grand Jury, but beginning at least in or about August 2016, and up to and including in or about March 2017, in the District of Maryland and elsewhere, the defendant,

**EUNICE BISONG NKONGHO,**

did knowingly combine, conspire, and agree with each other and with others known and unknown to the Grand Jury, including at least **Peter Unakalu, a/k/a "Peter Eromosefe Unuakhalu" ("Unakalu"); Eucharia Njoku, a/k/a "U.K.," a/k/a "Ukay," a/k/a "Rita" ("Njoku"); Khalid Razaq, a/k/a "Khalid Mohammed Razaq," a/k/a "Khalid Mohammed Razaq" ("Razaq"); Janet Sturmer, a/k/a "Janet Rhame," a/k/a "Janet Burnett" ("Sturmer"); Brandon Ross, a/k/a "Shaba," a/k/a "Shaba X" ("Ross"); Saulina Helen Eady ("Saulina Eady"); and Saul Eady**, to commit money laundering, in violation of 18 U.S.C. § 1956, to wit:

    a. to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity—to wit, wire fraud, in violation of 18 U.S.C. § 1343; mail fraud, in violation of

18 U.S.C. § 1341; interstate transportation of stolen property, in violation of 18 U.S.C. § 2314; and receipt, storage, and sale of stolen goods, in violation of 18 U.S.C. § 2315— with the intent to promote the carrying on of specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and

   b. to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity—to wit, wire fraud, in violation of 18 U.S.C. § 1343; mail fraud, in violation of 18 U.S.C. § 1341; interstate transportation of stolen property, in violation of 18 U.S.C. § 2314; and receipt, storage, and sale of stolen goods, in violation of 18 U.S.C. § 2315— knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

   c. to transport, transmit, and transfer, and attempt to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States, and to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(A); and

   d. to transport, transmit, and transfer, and attempt to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place

3

outside the United States, and to a place in the United States from or through a place outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership, and the control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and

    e. to transport, transmit, and transfer, and attempt to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States, and to a place in the United States from or through a place outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole or in part to avoid a transaction reporting requirement under state or federal law, in violation of 18 U.S.C. § 1956(a)(2)(B)(ii).

## Manner and Means of the Money Laundering Conspiracy

It was part of the conspiracy that:

8. The defendant engaged in financial transactions, including wire and bank transfers, wherein the proceeds from sales of fraudulently obtained goods delivered to the defendant and her co-conspirators located inside and outside of the United States, in ways designed to conceal and disguise the nature, source, ownership, and control of the proceeds.

9. In order to promote the scheme to defraud, the defendant and her co-conspirators deposited funds into the bank accounts of other members of the conspiracy to be used to pay for transportation, storage facilities, and other expenses of the fraud scheme.

10. The defendant and her co-conspirators used proceeds of the fraud scheme to directly fund the temporary receipt, local storage, and cross-country transportation of fraudulently obtained equipment and products from within the District of Maryland and elsewhere to California for the purpose of converting such items into additional proceeds.

11. The defendant and her co-conspirators transferred proceeds of the fraud scheme to other members of the conspiracy, knowing that the proceeds were derived from the fraud scheme, with the intent that the co-conspirators further transfer proceeds of the fraud scheme to members of the conspiracy located overseas.

12. Leaders of the conspiracy directed members of the conspiracy responsible for converting products obtained via the scheme to defraud into cash to compensate other members of the conspiracy for their contributions to, and participation in, the fraud scheme.

13. The scheme to defraud included the overt acts by the defendant and her co-conspirators in the District of Maryland and elsewhere:

    a. On or about September 2, 2016, during a trip to Los Angeles, **Razaq** paid approximately $920 to FedEx in Los Angeles for the shipment of 99 iPhones and 99 iPads.

    b. Between on or about September 2, 2016, and September 6, 2016, following the sale in California of stolen iPhones and iPads, members of the conspiracy delivered a portion of the proceeds of the sale to **NKONGHO** in cash.

    c. On or about September 6, 2016, **NKONGHO** purchased two cashier's checks for $5,300 and $5,200 that she then deposited, along with a $4,100 cash counter deposit, into her JP Morgan Chase bank account. She then wired $7,500 to **Unakalu** in Nigeria.

    d. On or about September 12, 2016, **NKONGHO** additionally wired $8,500 to **Unakalu** in Nigeria.

e. On or about September 19, 2016, **Ross**, **Razaq**, and **Njoku** arranged, in California, for the sale of a second shipment of iPhones and iPads that had been shipped from Maryland.

f. After **Ross**, **Razaq**, and **Njoku** each received a portion of the proceeds from the sale of the second shipment of iPads and iPhones, a member of the conspiracy provided the remainder of the proceeds, all in cash, to **NKONGHO** on or about September 20, 2016.

g. On or about October 17, 2016, a member of the conspiracy in California deposited $4,000 in cash into a bank account held by **Barbour**.

h. On or about October 19, 2016, **NKONGHO** deposited $3,000 in cash at a Bank of America ("BOA") branch in Lynwood, California, into **Barbour**'s bank account held in Maryland, providing an address and phone number used by **NKONGHO**.

i. On or about October 25, 2016, **Barbour** wired $6,950 from his bank account to **Unakalu**, located in Nigeria, ostensibly for "family support."

j. On or about October 29, 2016, **NKONGHO** sent **Unakalu** a picture message via WhatsApp showing that **NKONGHO** deposited $8,145 into **Razaq**'s bank account.

k. On November 2, 2016, **Razaq** withdrew $5,000 from his bank account.

l. On or about November 2, 2016, and again on or about November 5, 2016, **Sturmer** (working with **Razaq**) rented storage facilities in Virginia for temporary storage of stolen flat screen televisions.

m. On or about November 5, 2016, **Unakalu** texted **NKONGHO** that he needed to give Ross "some money to travel to the [E]ast coast," and the next day directed **NKONGHO** to "Give B [**Ross**] one thousand dollars."

n. On or about November 14, 2016, after directing **NKONGHO** to send **Razaq** $5,000, **Unakalu** sent **NKONGHO** a picture of **Razaq**'s bank account information via WhatsApp.

o. On or about November 14, 2016, **NKONGHO** deposited $5,000 in cash at a BOA branch in Lynwood, California, into **Razaq**'s bank account, and then sent **Unakalu** a picture of the deposit slip showing the $5,000 deposit.

p. On or about November 14, 2016, **Razaq** withdrew $5,000 from his bank account.

q. On or about November 15, 2016, **Sturmer** and **Ross** sent 100 televisions via UPS to **Ross** in Los Angeles, California.

r. On or about November 17, 2016, **Unakalu** directed **NKONGHO** to give **Ross** $2,000, and further explained the cash was needed "to get storage spaces to store goods."

s. When **NKONGHO** questioned the amount as being too much, **Unakalu** responded "It is not enough . . I need spaces to store thousands of goods . . . but I intend to sell some quick to raise funds." **NKONGHO** replied, "Ok."

t. On or about November 28, 2016, **Ross** deposited $7,500 in cash at a California bank into **Razaq**'s bank account.

u. On or about December 2, 2016, **Ross** deposited $7,000 in cash at a California bank into **Razaq**'s bank account.

v. On or about December 13, 2016, **Ross** wired $2,955 to **Unakalu**, located in Nigeria, ostensibly for "family support."

w. On or about December 30, 2016, from a BOA location in California, **Saul Eady** deposited $4,860 in cash into **Razaq**'s bank account.

x. On or about December 30, 2016, from a different BOA location in California, **Saul Eady** deposited $5,640 in cash into **Razaq**'s bank account.

y. On or about January 6, 2017, a co-conspirator deposited $4,400 in cash into **Ross**'s bank account.

z. On or about January 9, 2017, **Ross** wired $4,355 to **Unakalu** in Nigeria.

aa. On or about January 19, 2017, **Ross** deposited $7,500 in cash into **Razaq**'s bank account.

bb. On or about January 23, 2017, a co-conspirator deposited $9,010 in cash into **Ross**'s bank account.

cc. On or about January 23, 2017, after receiving $9,010 in cash into his bank account, **Ross** wired $8,953 from that account to **Unakalu**, located in Nigeria, ostensibly as "investment income."

dd. Between January 27, 2017, and February 1, 2017, **Ross** and other co-conspirators in California made cash deposits into **Barbour**'s account totaling $10,400 to provide **Barbour** funds to pay a Maryland-based moving company to transport flat screen televisions from Virginia to California. **NKONGHO** provided some or all of the monies deposited by **Ross** and others into **Barbour**'s account.

ee. On or about January 30, 2017, a $9,300 payment was made to the Maryland-based moving company for movement of stolen televisions from Virginia to Maryland.

ff. On or about February 7, 2017, a member of the conspiracy in Nigeria directed **Razaq** via WhatsApp on how to distribute profits from the flat screen television scheme to other co-conspirators.

gg. On or about February 7, 2017, a member of the conspiracy deposited $8,050 in cash into **Njoku**'s bank account.

hh. On or about February 8, 2017, **Njoku** wired $8,000 from her bank account to **Unakalu**, located in Nigeria.

ii. On or about February 20, 2017, **Unakalu** directed **NKONGHO** to "Give Brandon [**Ross**] 15.400."

jj. On or about February 21, 2017, a member of the conspiracy at a bank in Tarzana, California, deposited $5,200 in cash into **Barbour**'s bank account.

kk. On or about February 27, 2017, **Barbour** wired $5,155 from his bank account to **Unakalu**, located in Nigeria, ostensibly for "family support."

ll. On or about February 27, 2017, **NKONGHO** reported to **Unakalu** that **NKONGHO** still had $120,290 remaining after sending **Unakalu** $9,000 for which **Unakalu** had asked.

mm. On or about February 27, 2017, **Unakalu** instructed **NKONGHO** to provide **Ross** $110,500 on March 1, 2017, so **Ross** "can get it where it's supposed to be."

nn. On or about March 1, 2017, **Ross** provided **Razaq** $108,570 in cash as the latter's share of the proceeds from the scheme to defraud.

oo. On or about March 13, 2017, **Unakalu** sent a message to **Razaq** asking if the latter had a bank account that could accept a transfer of $150,000.

18 U.S.C. § 1956(h)

## COUNT TWO
## (Money Laundering)

The Grand Jury for the District of Maryland further charges that:

### Introduction

1. Paragraphs 1 through 6 and 8 through 13 of Count One are incorporated here.

### The Charge

2. On or about October 19, 2016, in the District of Maryland and elsewhere, the defendant,

### EUNICE BISONG NKONGHO,

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce—that is, the defendant deposited and caused to be deposited $3,000 in cash at a Bank of America branch in California into a Bank of America account ending in x9296 held by **Barbour** in Maryland—which in fact involved the proceeds of specified unlawful activity—that is, wire fraud, in violation of 18 U.S.C. § 1343; mail fraud, in violation of 18 U.S.C. § 1341; interstate transportation of stolen goods, in violation of 18 U.S.C. § 2314; and receipt and sale of stolen goods, in violation of 18 U.S.C. § 2315—(a) with the intent to promote the carrying on of specified unlawful activity, and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity; and that while conducting or attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

18 U.S.C. § 1956(a)(1)(A)(i) and (B)(i)
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 982(a)(1) and (b)(1) and 21 U.S.C. § 853(p) in the event of the defendant's convictions under any of the offenses in Counts One and Two of this Indictment.

### Money Laundering Forfeiture

2. Upon conviction of either of the offenses charged in Counts One and Two, the defendant,

**EUNICE BISONG NKONGHO,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offenses, and any property traceable to such property.

### Property Subject to Forfeiture

3. The property to be forfeited includes, but is not limited to, the following: a money judgment in the amount equal to the value of any property involved in the money laundering offenses, which sum shall be at least $7,728,596.

### Substitute Assets

4. If, as a result of any act or omission of the defendant, any such property subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty,

the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1), shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above.

18 U.S.C. § 982(a)(1) and (b)(1)
21 U.S.C. § 853(p)

_____ /AUSA
Jonathan F. Lenzner
Acting United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

Date: 9/29/21