IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. GJH-21-396 |
| | * | |
| EUNICE NKONGHO, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | * | |

******

## GOVERNMENT'S SENTENCING MEMORANDUM

The Defendant, Eunice Nkongho, laundered money derived from an international wire and mail fraud conspiracy.   She received money from and distributed money to co-conspirators and used several techniques to hide the origin and destination of the funds.   She also assisted in managing the storage of seized televisions and policed others to ensure they were using a "secure" communications platform.   Her participation in the money laundering conspiracy extended over at least seven months.   Given the duration and nature of her activities, a sentence of imprisonment is appropriate, as well as orders of forfeiture and restitution.

**Presentencing Report**

The Government has reviewed and has no objections to the presentencing report as issued with one exception.   Paragraph 11 of the presentencing report, based on the Government's submission, notes that "over one thousand Apple iPhones and hundreds of iPads were fraudulently obtained from a United States Government contract vendor."   With respect to the iPads, that is incorrect.   Are review of the internal T-Mobile investigative report by Ryan Messinger (who testified at trial) reveals that although hundreds of iPads were ordered and shipped, only 166 iPad tablets were delivered to the conspirators.

1

**Sentencing Recommendation: 18 U.S.C. § 3553(a) Factors**

*Nature and Circumstances of the Offense*

As shown through extensive evidence presented at trial, the Defendant engaged in a money laundering conspiracy and substantive money laundering in support of wire and mail fraud as well as the transport, storage, and sale of stolen goods.   As she admitted in a post-arrest interview, the Defendant received cash from co-conspirators (including Khalid Razaq and Brandon Ross) and then distributed money to her conspirators.   Specifically, in addition to other admissions, she admitted that Peter Unakalu asked Khalid Razaq to give her money and that Peter wanted her to give it to "X, Y, and Z people."   Evidence at trial showed that she distributed money by various means:

- Deposits of cash to joint accounts owned with her children that she then used to fund wires to Peter Unakalu.
- Opening of new joint accounts with her children that were used to hold money briefly before the money was withdrawn for wiring to Unakalu.
- Transfers of cash back and forth with Brandon Ross.
- Multiple deposits of cash directly into a bank account owned by Khalid Razaq and opened for the express purpose of handling money from the scheme.   Monies from this account were used for storage, transport, and shipping of stolen goods in and from Virginia and Maryland—including communications equipment and LG televisions
- At least one deposit into the account of Troy Barbour who paid for shipping of televisions from Maryland to California.
- A large, bulk transfer of cash to Brandon Ross of approximately $110,000 that ultimately was delivered to federal agents.

The evidence presented at trial also showed that she knew that the money was derived from Apple products (per the testimony of Razaq) as well as televisions (per texts with Unakalu and her own admissions).   Nkongho's husband, who had been deported from the United States after a prior fraud conviction, directed her from Nigeria to move money related to the transport, storage and a sale of goods.   Nkongho was not merely a disinterested observer.   She was security

conscious—she insisted that her conspirators use WhatsApp in communications with her regarding the money movements.   And she even sought to get better deals on storage space (i.e., first month's rent free) to maximize proceeds from the scheme.   For all of the transactions she undertook with individuals, including at least with Razaq and Ross involving the transfer of cash in bags, there is no evidence that a single receipt was generated by this sophisticated business woman who has her own business and understands the necessity of paperwork for, among other things, filing taxes.

Some of the money from the scheme remained in the joint accounts with her children, but the vast majority was transferred to conspirators to pay their share or to promote the ongoing enterprise.   As became apparent at trial through the review of text messages by both the Government and the Defense, Nkongho visited Nigeria during the Christmas season of 2016 and is believed to have carried at least some cash from the scheme with her during that trip.

Apple products (acquired through T-Mobile USA) and LG televisions (acquired through ACE Marketing Group, Inc.) were sent to the West Coast.   The total loss of unrecovered devices to T-Mobile USA was $1,279,415.86 (1048 iPhone 6S devices and 166 iPad 129 tablets). Approximately $1.1 million worth of Apple devices were sent to California.   The total value of the 1131 unrecovered LG televisions, as calculated by ACE Marketing Group, Inc.'s owner, was $3,185,466.80.   Govt. Exh. 44.   Of these, approximately 885 televisions were sent to California. [1,2]   The approximate value of televisions that arrived on the West Coast was

---

[1]  It is believed Khalid Razaq diverted and sold approximately 250 of the unrecovered TVs for his own profit. There is paperwork to support at least 120 units of that diversion amount.   If Razaq diverted approximately 250 TVs, the remaining unrecovered TVs would be 881.

[2]  A total of 1089 TVs were contracted to be shipped to California by various moving companies based on contracts and shipment records, including records admitted at trial.   See, e.g., Govt. Exh. 26.11 (150 units); Govt. Exh. 80.11 (812 units total).   Of those TVs, 204 were interdicted and returned to ACE Marketing Group by the FBI.   The remaining 885 TVs are believed to have been shipped to California.   This number correlates closely to the number of unrecovered TVs left unaccounted for if Razaq diverted approximately 250 TVs.

$2,492,606.65.[3]

Notably, the foreseeable loss should include the value of the televisions that were interdicted at the shipping companies but directed to California, including at least 188 televisions with a total value of $541,111 that were flagged by FedEx and recovered in Memphis.

*History and Characteristics of the Defendant*

The Defendant is a credentialed professional and business owner with an advanced degree, various streams of income, and property holdings.   Her husband had not been present in the United States for years at the time of the fraud and money laundering scheme.   She claimed hundreds of thousands of dollars a year in income from her various businesses and employment. She most certainly did not "need the money."   She was not in a "tight spot" for cash and, even if she were, she was in the enviable position of having perfectly legal means of dealing with any cash shortfall, i.e., selling some assets.

*Meeting the Purposes of Sentencing*

Crimes like these—where the planners and instigators are overseas—cannot be perpetrated without the willing assistance of accomplices in the United States.   The results of such conspiracies—like this one—can result in the theft of millions of dollars of stolen goods.   Such conspiracies—like this one—wreak havoc on the lives of individual people who bear the personal cost of the crime.

Here, witness Jason Collins testified that he lost his job at T-Mobile as a result of the scheme.   David Mann related that he had to scramble to recover, store, and resell LG televisions at a significant emotional and financial (at least $30,000) toll.   The fact that the Defendant might

---

[3]  The approximate value of the televisions sent to California was calculated by multiplying the value of unrecovered televisions by the fraction of unrecovered televisions sent to California out of the total number of unrecovered televisions: $3,185,466.80 X 885/1131 = $2,492,606.65.

not have known these victims only underscores the immense threat of an organized conspiracy where each member has a role and denies (perhaps to themselves) the costs inflicted on others they do not see.   Certainly, the conspiracy and acts of money laundering shown at trial were a necessary part of the overall criminal scheme—the motive here was profit and greed, after all.

For these reasons, this sort of conduct needs to be deterred both generally and specifically with this Defendant.    To be clear, not only did the Defendant commit crimes, but she enabled the commission of other related crimes by Razaq and Ross and Barbour and Unakalu—to each of whom she gave or sent money, or both.   A term of imprisonment is appropriate and necessary to promote respect for the law.   The term of imprisonment should be just in that it should be proportional to the economic and other damage caused by the crime.

The Defendant's co-defendants who have been sentenced so far received 24 months (Njoku), 36 months (Saulina Eady), and 48 months (Saul Eady).   The Sentencing Guidelines for the Defendant of 97 months to 121 months are much more substantial than for any of the previously sentenced defendants—all of whom pled guilty.

*Imprisonment*

Based on a trial conviction, the evidence presented, and the Defendant's role in the conspiracy, a sentence of imprisonment at the bottom of the calculated guidelines would is necessary in this case to meet the goals of sentencing.   The Government acknowledges, however, that the Court has sentenced other codefendants beneath their calculated guidelines level, and that the Defendant is the mother of two school-age children with no prior criminal record.   The Government defers to the court on the weight, if any, those facts should carry in determining the period of imprisonment.

Respectfully submitted,

Erek L. Barron
United States Attorney


By:_____/s/_____
        Joseph R. Baldwin
        Adam Ake
        Assistant United States Attorney